## Raines v. Commonwealth.

(Decided April 27, 1926.)

Appeal from Jefferson Circuit Court
(Criminal Division).

1.  Witnesses—Where Witness for State, in Prosecution for Manslaughter, Testified that Deceased Threatened to Kill Defendant, His Written Statement to Police Omitting Such Fact Held Com-

petent Evidence.—Where defendant's brother, as witness for state in prosecution for manslaughter, testified that deceased threatened to kill defendant if latter did not go with him, but omitted such fact in written statement made to police department, such written statement held competent evidence, not violating rule that party may not contradict his witnesses by evidence of other statements except as to such testimony as is prejudicial to party calling him.

2. Homicide—Instruction in Prosecution for Manslaughter that Accused was Not Guilty if in His Home he Killed Deceased to Avert Impending Danger, Believing that Deceased had Entered it to Kill Him, Held Error.—Instruction in prosecution for manslaughter that accused was not guilty if in his home he killed deceased to avert impending danger, believing that deceased had entered it to kill him, held error, since it confuses right of self-defense with right to eject deceased from his home.

3. Homicide—One May Take Life of Intruder in Ejecting Him from His Home if Intruder Resists and Thereby Places Owner in Danger of Loss of Life.—One may take life of intruder in ejecting him from his home if intruder resists and thereby places owner in danger of loss of life or great bodily harm.

4. Homicide—Where Intruder was Killed in Being Ejected from Defendant's Home, Instruction Covering Ordinary Self-Defense and Also Defense of Home Held Proper.—Where intruder was killed in being ejected from defendant's home, instruction covering ordinary self-defense and also defense of home held proper.

CHARLES LAMB for appellant.

FRANK E. DAUGHERTY, Attorney General, and CHARLES F. CREAL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS—Reversing.

William Raines was convicted of manslaughter and sentenced to five years' imprisonment. The facts are: Appellant, a colored man, ran a restaurant in the city of Louisville and had a lease on a two-story building; his restaurant was on the first floor and back of this was a sleeping apartment, apparently occupied by himself and cook, Willie May Parks, a colored woman. He sublet the rooms on the upper floor to a colored woman, Mary Lou Harris, who occupied them with her two children. Serious friction had arisen between appellant and this tenant and he desired her to move. Her rent was paid to Saturday, March 20th, and she did not vacate the premises at once, but claims to have been seeking other quarters. She was visited by her brother, Ruben Arlington, and told him of

her difficulties. On the following Tuesday, Arlington, who was a stranger to Raines, called at the restaurant and asked for "Boo" Raines (a nickname for appellant). The latter was absent and his brother, Eugene, who was in charge of the restaurant at the time, so informed Arlington, who then sat down at the front door and remained until noon, when he gave his telephone number to Eugene, who promised to have his brother call him up. During the time he was there he inquired of each of several customers who entered, if he was "Boo" Raines. His manner was such as to attract attention, and one of the parties testifies that he said to him that he was going to kill "Boo' Raines before night. Witness did not communicate this to appellant, but Eugene informed him in a general way of the situation and he remained away until he was informed that Arlington was gone. He then returned to the restaurant and about three o'clock Arlington returned. Appellant did not know Arlington, but was informed by Eugene that he saw him coming and went back into the bedroom of Willie May Parks. As to what occurred thereafter only two eye-witnesses have testified, appellant and Eugene, the latter being introduced by the Commonwealth.

Eugene testifies that Arlington walked to the door and asked, "Where is Boo?" that he told him that he was in his room, to wait and he would call him; that appellant asked, "What is it?" and he answered, "This fellow wants to talk to you." Appellant then asked. "What do you want?" and Arlington said, "Come upstairs and talk to my sister with me," and appellant said, "I don't see any need of talking to your sister; she has paid her rent and she said she was going to move; there is no need for me to go up there." After some discussion Arlington said, "Why aren't you going to go?" and appellant responded, "I don't want to go," and shut the door in Arlington's face; that Arlington kicked the door and with his right hand forced the latch and shoved the door open, his left hand being to his waist, cursing appellant and saying, "You will come upstairs or I will kill you;" that appellant was saying that he was afraid of him and did not have to go upstairs; that Arlington forced his way and said, "Yes, you are going up," and soon after he entered the room one shot was fired. Arlington turned and ran ten steps into the street where he fell and expired.

Appellant states that he had heard on Monday that Arlington was angry with him and seeking to do him injury and requested Mary Harris to advise him to stay away, which she declined to do; that he remained away from his business on Tuesday morning in order to avoid him, but upon receiving information at 12 o'clock that Arlington was gone, he went back to his place of business and remained until Eugene told him that he saw Arlington coming, and left the restaurant to avoid him; that Arlington forced his way back as testified by his brother, and agrees with his brother's narration as to what happened thereafter; that Arlington cursed and ranted and he shut the door in his face; that Arlington kicked it open and he went to the bed and got his pistol and told him to get out of the way, but that Arlington walked in, swore again and lunged at him; that he backed as far as he could and continued to tell him to go out, but that Arlington continued to advance, with his hands in his bosom, and he fired. It is further shown that Arlington was a larger man than appellant, but according to the evidence on the trial no weapon of any kind was found upon his person or upon the street where he lay, though in the motion for a new trial appellant filed the affidavit of a newly discovered witness, tending to show that a knife was there taken from his person.

The Commonwealth introduced a written statement made by Eugene Raines to the police department in which he omitted to state that Arlington threatened to kill his brother if he did not go up the stairs with him, and in some other respects was not so favorable to appellant as was his testimony. This is urged as error.

The rule is that a party may not contradict his own witnesses by evidence of other statements, except as to such testimony as is prejudicial to the party calling him. In other words, he cannot under the guise of contradiction introduce in evidence matters more favorable to his cause than that testified to by the witness, when the latter's testimony is merely negative. It does not appear that this was done in this case. The witness was the appellant's brother, and the Commonwealth did not seek by the introduction of the statement to prove any new facts to make out its case, but merely showed that in his original statement the witness did not mention certain facts favorable to the defendant and prejudicial to the Commonwealth to which he testified on the trial. We think the evidence competent.

The instruction on self-defense reads:

"If you believe from the evidence that the defendant, William Raines, at the time of the killing was in his own house, or in a house of which he had control, and that he had reasonable grounds to believe and did believe that Ruben Arlington had entered said house with the purpose of killing said Raines, or of doing said William Raines great bodily harm, then said Raines had the right to use such force as was necessary or reasonably appeared to said Raines to be necessary to avert such impending danger, real or apparent, even to the taking of the life of said Arlington, and if deceased was shot and killed by the defendant under the state of case set out above, you will find the defendant not guilty."

This instruction confuses appellant's right of self-defense with his right to eject deceased from his home, and includes part of the definition of each, but neither is complete; also his right to rely on either is made to turn upon Arlington's purpose in entering the house. The jury may have believed that Arlington went to the house for the purpose of peaceably persuading Raines to talk the matter over with his sister and yet have further believed that after his entry into the house he refused to leave, and assaulted appellant as testified by appellant and his brother, and that appellant was in actual or apparent danger of death or great bodily harm at the time he fired the fatal shot, but even if they so believed they could not acquit under this instruction.

One may eject an intruder from his home and use such force as is reasonably necessary for that purpose, short of doing the intruder great bodily harm, and if the intruder resists such expulsion and thereby places the owner in danger of loss of life or great bodily harm, he may then in his self-defense take the life of the intruder without seeking other ways to avert the danger, real or apparent, and when no other felonious act of the intruder appears, this constitutes the chief distinction between defense of home and ordinary self-defense, but in such cases the right of self-defense is enlarged, not abridged, and it is proper to give the ordinary self-defense instruction, and also to instruct the jury as to his right to eject the intruder from his home and the force he may use in so doing. As pointed out in Hoover v. Com., 192 Ky. 490,

this may be done in separate instructions or all incorporated in the same instruction. In the Hoover case it is intimated that it might be more appropriate to incorporate both in one instruction, though perhaps it would be simpler to make them separate. As the case must be reversed for this manifest error and the other questions urged are not likely to occur again, a discussion of them is unnecessary.

Wherefore, the judgment is reversed and cause remanded for proceedings consistent with this opinion.